**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADVANCED ACCESS CONTENT SYSTEM LICENSING ADMINISTRATOR, LLC,<br><br>Plaintiff,<br><br>v.<br><br>LANNY SHEN d/b/a DVDFAB AND FENGTAO SOFTWARE INC., SUNREG TECHNOLOGIES LTD. d/b/a DVDFAB AND FENGTAO SOFTWARE INC., FENG TAO d/b/a DVDFAB AND FENGTAO SOFTWARE INC., SHEN XINLAN d/b/a AUDIO-DVD CREATOR, and JOHN DOE, JANE DOE and/or XYZ COMPANY d/b/a DVDFAB, RIPPERBLU-RAY.COM, DVDFABB.COM and DVDFFAB.COM,<br><br>Defendants. | Civil Action No.<br>14 Civ. 1112 (VSB)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE CLERK'S DEFAULT** |

Defendant Feng Tao d/b/a Fengtao Software, by his undersigned attorneys, submits this memorandum of law and the accompanying Declaration of Feng Tao in Support of Motion to Vacate Clerk's Default dated June 20, 2014 ("Feng Decl.").

## FACTUAL BACKGROUND

### I.   FACTS REGARDING FENG TAO SOFTWARE

Defendant Feng Tao is the proprietor of Fengtao Software ("FTS") and is a Chinese citizen living in China. Mr. Feng's native language is Chinese. He can read simple English and speak some English, but cannot understand complex writing or legal terminology and cannot conduct a full conversation in English. Feng Decl. ¶¶ 1-2.

FTS is a Chinese software business solely owned by Mr. Feng that has been in operation since 2003.  FTS is not incorporated; it is a small business and thus does not have a general counsel.  FTS does not regularly use attorneys in China or any other country.  Until FTS hired its present counsel for this case, it had not hired a single lawyer in China, or anywhere else in the world, for more than five years.  FTS' "terms and conditions" for purchasers of the software was not prepared by an attorney, rather, FTS created it based on sample documents it found online.  Feng Decl. ¶ 3.

FTS is located in China.  It does not have an office, employees, nor any servers in the United States.  FTS develops, markets, and sells the DVDFab products offered on its website.  FTS' business activities are conducted from China, where FTS has a physical office where its employees work.  FTS maintains a mailing address in Beijing where it regularly receives mail sent to that address.  Feng Decl. ¶¶ 4-5.

FTS' business is conducted through the Internet.  FTS owns and operates numerous domain names and websites that offer its DVDFab products and provides the ability to make purchases online.  FTS controls the following domain names that were shut down by the injunction: DVDFab.com, DVDFab.net, DVDIdle.com, 3d-video-converters.com, 3dBluRay-ripper.com, Blu-Ray-ripper.us, Blu-Ray-Software.us, BluRayripper.jp, BluRaysbs3d.com, BluRaysoft.jp, CopyBluRay.us, DVDFab.jp, DVDFab9.com, DVDvideosoft.jp, kopiersoftware.com, macBluRaycopy.com, mourlife.com, readtechnews.com, sbs3d.com, sbs3dconverter.com, sbs3dcopy.com, sbs3dripper.com, tracehotnews.com, videoconverter.jp, wollytech.com, xn--dvd-ti4bzc1jla2oj3ne.com, 2d-3d-converter.com, copyDVDsoftware.us, sbs3dcreator.com, DVDFab.de, audio-dvd-creator.com, ripperBluRay.com, DVDFabb.com and DVDFfab.com (the "DVDFab Domain Names").  Feng Decl. ¶¶ 6-7.

When FTS registered the DVDFab Domain Names, it did not have an organized approach and used various names to register them for convenience. Anyone who visited one of the sites would know it was part of DVDFab, as the name was always prominently displayed, the graphics were the same, and the content was mostly the same. Feng Decl. ¶ 8.

## II.   FACTS REGARDING FTS' USE OF ENGLISH

FTS uses English as the default for the primary website because English is the most popular language on the Internet. Feng Decl. ¶ 30. According to W3Techs, a web technology survey company, more than 55% of the 10 million most visited websites in the world use English as their content language. *See* Exhibit A to the Declaration of Nancy J. Mertzel, dated June 20, 2014 ("Mertzel Decl."). German is the second most popular language, and trails far behind at 6.1%. Notwithstanding China's population of over one billion, only 3.0% of the most visited websites use Chinese as the content language. *Id.*

In addition, English is often considered a global *lingua franca*, particularly for international transactions. *See* Mertzel Decl., Ex. B. "[I]n most cases, it is 'a contact language' between persons who share neither a common native tongue nor a common (national) culture, and for whom English is the chosen foreign language of communication." *Id* at 339. Because FTS' business operates on an international scale, and often does not share a common language with its customer base, it uses "English as an international language." *Id.*

A study published by the Education First organization asserts that "English has become the de facto language of communication not only in international business, but also in nearly every context where two people do not share a language." *See* Mertzel Decl., Ex. C, p. 34. The study goes on to confirm that "an increasing number of companies have recognized the long-term advantages to productivity and growth that adopting English as a

3

common…language can have," citing Nokia, SAP, Samsung, Aventis and Renault as international companies that have mandated English as the corporate language. *Id.* at 38.

FTS markets its products globally. Using English as a default language does not mean that FTS is primarily targeting its products to the United States. According to the British Council, relying on sources from the 1990s, English has official or special status in at least seventy five countries with a total population of two billion. *See* Mertzel Decl., Ex. D. Additionally, English is spoken by 375 million as a first language, 375 million as a second language and around 750 million as a foreign language. *Id.*

## III.   FACTS REGARDING THE NAMED DEFENDANTS

None of the other names listed as a defendant should be in this case. Feng Decl. ¶ 9.

- "Lanny Shen d/b/a DVDFab and Fengtao Software Inc." – Lanny Shen is an individual who has no control over or participation in FTS. Lanny Shen lent FTS a credit card to register the following domain names (at FTS' expense): dvdfab.net and DVDIdle.com. Feng Decl. ¶ 9a.

- "Sunreg Technologies Ltd. d/b/a DVDFab and Fengtao Software Inc." – Sunreg Technologies is not a company. It was a name used to register the domain name sunreg.com many years ago. The domain name sunreg.com is not in use and was not for any websites selling DVDFab Software. Other domain names FTS registered under Senreg Technologies Ltd. are: BluRayripper.jp, BluRaysoft.jp, DVDFab.jp, DVDvideosoft.jp, and videoconverter.jp. Feng Decl. ¶ 9b.

- "Feng Tao d/b/a DVDFab and Fengtao Software Inc." – Defendant is Feng Tao, and his business is called Fengtao Software. Mr. Feng is not doing business as DVDFab. DVDFab is the name of his product line. He registered DVDFab.de in his own name. Feng Decl. ¶ 9c.

- "Shen Xinlan d/b/a Audio-DVD Creator" – Shen Xinlan is the same person as Lanny Shen, discussed above. Shen Xinlan is the pinyin version of the name, and Lanny Shen is the westernized version. This name was used to register the following domain names: dvdfab.com, 3d-video-converters.com, 3dBluRay-ripper.com, Blu-Ray-ripper.us, Blu-Ray-Software.us, BluRaysbs3d.com, CopyBluRay.us, DVDFab9.com, kopiersoftware.com, macBluRaycopy.com, mourlife.com, readtechnews.com, sbs3d.com, sbs3dconverter.com, sbs3dcopy.com, sbs3dripper.com, tracehotnews.com, wollytech.com, xn--dvd-

4

ti4bzc1jla2oj3ne.com, 2d-3d-converter.com, copyDVDsoftware.us, sbs3dcreator.com, audio-dvd-creator.com, ripperBluRay.com, DVDFabb.com and DVDFfab.com. As noted above, Lanny Shen has no relation to the business. Lanny Shen is not doing business as Audio-DVD Creator. Audio-DVD Creator is the name of a product formerly sold by Fengtao Software. Feng Decl. ¶ 9d.

- "John Doe, Jane Doe and/or XYZ Company d/b/a DVDFab, RipperBlu-ray.com, DVDFabb.com and DVDFFAB.com" – There are no other unidentified individuals or companies who have an ownership in Mr. Feng's business. As previously mentioned, DVDFab is the name of his product line. RipperBlu-ray.com, DVDFabb.com and DVDFFAB.com are domain names. Feng Decl. ¶ 9e.

## IV.   FACTS REGARDING AACS'S KNOWLEDGE OF DVDFAB AND LACK OF COMMUNICATIONS

DVDFab has been on the market since 2007. AACS admits that it knew about the product since 2009, according to Mr. Leake's declaration, paragraph 11. However, AACS never contacted Mr. Feng or anyone at FTS to request that it discontinue offering the DVDFab Products before it started this lawsuit. AACS never made this request by phone, in writing, or in a "cease and desist" letter. After operating his business for years with no contact from AACS, Mr. Feng did not expect AACS to sue him, let alone sue him in the United States. Feng Decl. ¶ 10.

Instead, AACS started this case by asking the Court for an expedited hearing on its preliminary injunction motion. AACS's behavior suggests it was trying to catch FTS by surprise, so as to put it at a disadvantage. It seems extremely inequitable that AACS had approximately five years to prepare its case, while Mr. Feng had less than a week to locate a lawyer in another country to defend against an injunction. *See* Feng Decl. ¶ 11.

## V.   FACTS REGARDING NOTICE OF THE LAWSUIT

Mr. Feng did not find out about the lawsuit on February 24 when AACS apparently sent the emails. The AACS emails were sent in the evening, and because China Standard Time is 12 hours ahead, it was already February 25 in China when the emails

were sent.  They were not read right away because not all of those mailboxes are used in FTS' business, and the ones that are used in FTS' business receive a large volume of emails from customers.  Feng Decl. ¶ 12.

On February 26, a lawyer from a firm named Weiss & Moy, P.C. ("Weiss & Moy") sent FTS an attorney advertisement stating that it was sued in the United States and offering to assist FTS if it did not have an attorney.  This is the first time FTS found out about the case.  However, Mr. Feng did not know the lawyer and was unsure whether he could trust him.  Feng Decl. ¶ 13.

After receiving the attorney advertisement, FTS located the emails from AACS.  Mr. Feng did not understand that AACS could shut down the business by taking action in the United States.  Mr. Feng did not understand that he could be subject to litigation in the United States even though he lives in China and does not have an office or any employees in the United States.  Mr. Feng also did not understand that a lawsuit in the United States could be started by simply emailing papers to FTS in China.  Feng Decl. ¶ 14.

## VI.   FACTS REGARDING FTS' EFFORTS TO LOCATE COUNSEL AND PURSUE SETTLEMENT

Once Mr. Feng learned about the case, he tried to get a referral to an attorney in the United States.  He did not know any US attorneys, and did not have a regular attorney in China, so he asked a friend for help.  On February 26 or 27, 2014, Mr. Feng's friend contacted Keller & Heckman, a law firm in Washington D.C.  On approximately February 28 or March 3, the firm responded that it had a conflict of interest and could not take the case.  Mr. Feng's friend then contacted a lawyer in the Southeastern United States.  That lawyer also could not take the case, but offered to contact Womble Carlyle Sandridge & Rice, LLP ("Womble Carlyle").  FTS did not get a response right away, likely because the attorney it contacted was traveling.  Although FTS had contacted two

law firms with good reputations, it was unable to obtain counsel prior to the preliminary injunction hearing scheduled for March 4. Feng Decl. ¶¶ 15-18.

On March 10, the FTS domain names were shut down due to the injunction. FTS immediately followed up on its efforts to obtain counsel in the United States. That day, Mr. Feng spoke with his head of marketing, Frank, about the possibility of a settlement with AACS. They discussed an offer to delay the release of software relating to the latest Blu-ray products for a few weeks in exchange for restoration of their websites and domain names. Mr. Feng asked him to contact AACS to find out whether they would consider a settlement involving a delay. Feng Decl. ¶¶ 19-20.

Soon after this conversation, Frank informed Mr. Feng that he spoke with AACS' attorney and offered to delay FTS' releases of the latest circumvention products. Frank said he also told AACS that if they did not accept FTS' offer, FTS would distribute its software as freeware. Mr. Feng was not aware that Frank was going to discuss distributing FTS' software as freeware, and Frank did not have Mr. Feng's permission or approval to discuss that. Feng Decl. ¶ 21.

On March 11, Womble Carlyle responded that it had a conflict and could not take the case. Womble Carlyle referred FTS to a few attorneys in New York City. Also on March 11, FTS contacted Nancy Mertzel of Schoeman Updike Kaufman Stern & Ascher LLP ("Schoeman Updike"). Mertzel Decl. ¶ 2. Finally, on March 11 or 12, FTS contacted an attorney at Troutman Sanders LLP. Feng Decl. ¶¶ 22-23.

Around that date, FTS also contacted the attorney at Weiss & Moy, who had previously written to Mr. Feng about the case. On March 14, the firm reported it did not have a conflict of interest and forwarded an engagement letter. However, on March 15 Weiss & Moy informed FTS that it did not have the staff to handle the case until the very end of March. Feng Decl. ¶ 24.

7

That weekend, FTS informed Nancy Mertzel that it would like to proceed with Schoeman Updike. On March 17, FTS signed an engagement letter with Schoeman Updike. The scope of the engagement was to provide an initial assessment of certain issues in the case. The engagement letter stated that, at the time, the firm had not agreed to appear as counsel of record to defend the litigation. Feng Decl. ¶ 25; Mertzel Decl. ¶ 3-4.

Mr. Feng did not intend to default in this matter. Once he engaged Schoeman Updike, he needed the firm to answer many questions, and the firm needed to conduct its initial assessment of the case. This could not be completed in one day, particularly given the different time zones. It never occurred to Mr. Feng to contact the Judge or the Court directly, or to ask AACS for an extension. He was not aware that a defendant could do these things. He have never heard the term "pro se" before and was not aware that a defendant could represent himself in a United States lawsuit. Feng Decl. ¶¶ 26-27.

## VII.   FACTS REGARDING FENGTAO SOFTWARE'S GLOBAL MARKET

Fengtao Software's market is global in scope, with the exception that it now blocks sales of certain products to the United States. FTS' primary website was located at www.dvdfab.com until it was shut down by the injunction. FTS selected a .com top level domain ("TLD") because it is the most popular TLD in the world, especially for business. Registration of a .com domain name is available to anyone, and is not limited to registrants in the United States or to businesses that primarily target the United States. According to Alexa, 8 of the top 25 most popular internet sites are .com sites that are not based in the US or primarily targeted to the US: Baidu.com (#5), QQ.com (#7), Taobao.com (#8), Hao123.com (#15), Weibo.com (#16), Tmall.com (#18), Sohu.com (#19) and VK.com (#20). Feng Decl. ¶¶ 28-29; and Exhibit 1 thereto.

FTS' primary website defaults to the English language.  FTS uses English as the default for its primary site because English is the most popular language on the Internet, and FTS markets its products globally.  English is often the language used between people with different first languages.  Using English as a default language does not mean that FTS is primarily targeting its products to the United States.  Millions of people around the world speak English, and many of them are located outside the United States.  Feng Decl. ¶ 30.

## VIII.   FACTS REGARDING FENGTAO SOFTWARE'S NON-US SALES

The overwhelming majority of Fengtao Software's worldwide sales are to purchasers located outside the United States.  Prior to the injunction, approximately 65% of Fengtao Software's worldwide sales of the following products listed in the Injunction were to locations outside the United States: (1) DVDFab Blu-ray Ripper (3D plus); (2) DVDFab Blu-ray Copy; (3) DVDFab Blu-ray to DVD Converter; (4) DVDFab HD Decrypter; (5) Passkey for Blu-ray; and (6) Passkey Lite (collectively, the "Accused Software").  Sales that originate in China to purchasers located outside the United States do not involve any circumvention in the United States.  As explained above, the software is not made in the United States, and the sales are made directly to purchasers outside the United States.  Feng Decl. ¶¶ 31-32.

## IX.   FACTS REGARDING THE UNRELATED PRODUCTS

Fengtao Software also sells software products that do not circumvent technological measures developed or licensed by AACS-LA.  These products include the following: DVD Copy, DVD Ripper, DVD Creator, Blue-ray Creator, Video Converter, 2D to 3D Converter (the "Unrelated Products").  These products have nothing to do with AACS.  Feng Decl. ¶ 33.

Here is a summary of the functionality of the Unrelated Products:

      a.     DVDCopy: Reads and writes only DVD-Video standard-compliant material to or from optical, magnetic or flash media. It does not work with Blu-ray discs or content of any type, and does not circumvent AACS technology.

      b.     DVD Ripper: Converts DVD-Video source material to other file formats for playback. It does not work with Blu-ray discs or content of any type, and does not circumvent AACS technology.

      c.     DVD Creator: Allows conversion of non-DVD video segments (e.g. home movies) to a fully DVD-Video compliant output for playback on any DVD player. It does not read or write Blu-ray content, and does not circumvent AACS technology.

      d.     Blu-ray Creator: Allows conversion of non-Blu-ray video segments (e.g. home movies) to an output format playable on any Blu-ray player. It does not circumvent AACS technology.

      e.     Video Converter: Performs inter-format conversion of video files for playback on certain devices. It does not read files protected by digital rights management, does not read DVD or Blu-ray content from disk, and does not circumvent AACS technology.

      f.     2D to 3D Converter: Converts two-dimensional audio visual content to three dimensional output in various file formats. The 2D to 3D converter module is an adjunct product that requires another program such as DVD Ripper, Video Converter or Blu-ray Ripper. It does not have the ability to decrypt protected DVD or Blu-ray content, or to circumvent AACS technology.

Feng Decl. ¶ 34.

<u>ARGUMENT</u>

I.    THE CLERK'S DEFAULT SHOULD BE VACATED PURSUANT TO FED. R. CIV P. 55(C)

      The Clerk's entry of default should be vacated under Rule 55(c).  In general,
"defaults are not favored, particularly when the case presents issues of fact and doubts are
to be resolved in favor of a trial on the merits." *Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir.
1981).  Courts have a "preference for resolving disputes on the merits," since "[d]ismissal is
a harsh remedy to be utilized only in extreme situations." *Brien v. Kullman Industries, Inc.*,
71 F.3d 1073, 1077 (2d Cir. 1995), *quoting Cody v. Mello*, 59 F.3d 13, 15 (2d Cir. 1995).  *See
also General Tel. Corp. v. General Tel. Answering Service*, 277 F.2d 919, 921 (5th Cir. 1960)
(default judgment with injunctive relief was "a completely drastic one with wide and
comprehensive injunctive effect.").

      A clerk's entry of default "may be set aside by a court for good cause." *Car-
Freshner Co. v. Air Freshners Inc.*, No. 7:10-CV-1491, 2012 WL 3294948 at *4 (N.D.N.Y
Aug. 10, 2012).  In deciding whether good cause exists, courts consider whether the default
was willful, whether the plaintiff has been prejudiced, and whether the defendant has a
meritorious defense.  *Id.*  In addition, courts can consider relevant equitable factors,
including, "whether the failure to follow a rule of procedure was a mistake made in good
faith and whether the entry of default would bring about a harsh or fair result." *Enron Oil
Corp. v. Diakuhara*, 10 F.3d 90, 96 (2d Cir. 1993).

      Although the factors considered in deciding a motion to vacate a clerk's
default are the same as those considered in deciding a motion to vacate a default judgment,
in the former situation, courts apply a more "lenient" standard. *Meehan v. Snow*, 652 F.2d
274, 277 (2d Cir. 1981).  According to the Second Circuit, "the standard for setting aside the
entry of a default pursuant to Rule 55(c) is less rigorous than the 'excusable neglect'
standard for setting aside a default judgment by motion pursuant to Rule 60(b)." *Id.*  While

11

"the factors examined in deciding whether to set aside a default or a default judgment are the same, courts apply the factors more rigorously in the case of a default judgment." *Enron Oil,* 10 F.3d at 96.

Here, there was an entry of a default pursuant to Rule 55(c), and not an entry of a default judgment under Rule 60(b). Accordingly, the "lenient standard of Rule 55(c) for determining whether to relieve a party of a default" should be applied in this case. *Meehan,* 652 F.2d at 277.

## II.   MR. FENG HAS MORE THAN SATISFIED THE STANDARD FOR VACATING THE CLERK'S DEFAULT

### A.   Mr. Feng's Failure to Timely Answer Was Not Willful

Defendant Feng did not willfully default in this matter. He is a Chinese national who was sued in a foreign country halfway around the world, and was served by email with papers that were not written in his native language. Feng Decl. ¶ 2. The reason he defaulted is explained by his need to secure counsel. This behavior is far from egregious or willful. *See SEC v. McNulty,* 137 F.3d 732, 738 (2d Cir. 1998) (defaults are willful where "the conduct of counsel or the litigant was egregious and was not satisfactorily explained").

As noted above, when Mr. Feng learned of the action, he endeavored to engage counsel in the United States. Feng Decl. ¶ 15. He contacted two firms prior to the preliminary injunction hearing, but was unable to locate counsel. Feng Decl. ¶¶ 16-18. He continued looking. Of the six firms contacted, two firms were not qualified for the engagement, and three firms declined the engagement, citing conflicts with the members of AACS. Feng Decl. ¶¶ 16-18; 22-25.

Mr. Feng's failure to timely answer is due to his inability to obtain counsel, and does not constitute willfulness or bad faith. *See American Alliance Ins. Co. v. Eagle Ins. Co.,* 92 F.3d 57, 60 (1996) (in evaluating the willfulness standard, the Second Circuit

looks for "bad faith, or at least something more than mere negligence"). "Willfulness within this [Second] Circuit does not include careless or negligent errors even when the negligence is gross." *Car-Freshner Co.*, 2012 WL 3294948 at *4 *quoting Am. Alliance Ins. Co.*, 92 F.3d at 61. *See also BMW of North America, LLC v. DinoDirect Corp.*, No. C 11–04598, 2012 WL 6000573 (N.D. Cal. Nov. 30, 2012) (failure of Chinese defendants to obtain counsel where they had limited experience with US law was neglectful but not culpable).

  The fact that firm after firm declined the matter due to a conflict of interest is not surprising, given that AACS is comprised of International Business Machines Corporation; Panasonic Intellectual Property Corporation of America; Microsoft Corporation; SCA IPLA Holdings (an affiliate of Sony Corporation of America); Toshiba America Information Systems, Inc.; Warner Bros. Entertainment, Inc.; Disney Worldwide Services, Inc.; and DCP, LLC . Complaint ¶16. As Plaintiff has alleged, these companies, or their corporate affiliates, include motion picture content providers, consumer electronics manufacturers, and information technology companies. Collectively, the members of AACS undoubtedly work with scores of intellectual property attorneys. Even counsel without a formal conflict of interest may decline representation on the grounds that Mr. Feng may be perceived to be a so-called "undesirable" client. Defendant Tao's difficulty in engaging counsel strongly mitigates any finding that he willfully defaulted. *See Original Appalachian Artworks, Inc. v. Yuil Int's Trading Corp.*, 105 F.R.D. 113, 116 (S.D.N.Y. Mar. 11, 1985) (holding that "[a] bona fide effort to find counsel is certainly relevant to the willfulness of a party's default").

  Even assuming, *arguendo*, that the default was in fact willful, willful conduct is a factor that "is relevant but not dispositive" in vacating a default judgment. *I.L.G.W.U. Nat'l Retirement Fund v. Meredith Grey, Inc.*, 986 F. Supp. 816, 823 (S.D.N.Y. Dec. 8, 1997). In other words, a default that "may be justly characterized as willful" can still be excused

for "compelling reason[s]." *Wagstaff-EL v. Carlton Press Co.*, 913 F.2d 56, 57 (2d Cir. 1990) (default judgment vacated because defendant had a meritorious defense and plaintiff would not be prejudiced upon default being vacated); *see also Kumar v. Ford*, 111 F.R.D. 34, 39 (S.D.N.Y. June 17, 1986) (the court held that "notwithstanding defendant's willful conduct in deciding not to answer the complaint, the motion to vacate the default judgment is granted. The defendant has established the existence of a possible defense, and there is no prejudice to the plaintiff.").

**B.    AACS Has Not Been Prejudiced**

Second, "plaintiffs cannot seriously argue that they will be prejudiced by vacating the default." *Dorrough v. Harbor Securities, LLC*, No. 99-CV-7589, 2002 WL 1467745 at *4 (E.D.N.Y. May 10, 2002). The only argument regarding prejudice Plaintiff could assert is delay, however, "delay alone is not a sufficient basis for establishing prejudice." *Cody v. Mello*, 59 F.3d 13, 16 (2d Cir. 1995). Conceding the point, Plaintiff did not even mention prejudice in its discussion of why Tao should not be entitled to vacate the default. *See* Memorandum of Law in Opposition to Motion to Amend Injunction, p. 14. *See also Traguth v. Zuck,* 710 F.2d 90, 94 (2d Cir. 1983) (motion to set aside default granted, in part because "plaintiffs neither alleged nor proved prejudice").

**C.    Defendant Tao Has Meritorious Defenses**

As set forth more fully below, Mr. Feng's defenses are that 1) the Copyright Act does not apply extraterritorially, 2) the predicate act exception is incorrect and inapplicable, and 3) he need only show a meritorious defense regarding the Injunction.

A defendant seeking to vacate a default judgment need not conclusively establish the validity of the defense(s) asserted. *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983). Rather, the defendant must make some showing of the defenses' existence other than mere allegations. *Tecnart Industria E. comercio Ltd. v. Nova Fasteners Co.*, 107

14

F.R.D. 283, 285 (E.D.N.Y. 1985).  In other words, "a defense is meritorious if it is good at law so as to give the factfinder some determination to make." *American Alliance Ins. Co.,* 92 F.3d at 61 *quoting Anilina Fabrique de Colorants v. Aakash Chemicals and Dyestuffs, Inc.,* 856 F.2d 873, 879 (7th Cir. 1988).  Finally, "in deciding a motion to vacate a default judgment, a court does not pass judgment on the merits of the defense.  The court only determines if the defense is supported by more than mere allegations and raises serious questions as to the validity of the claim." *I.L.G.W.U. Nat'l Retirement Fund,* 986 F. Supp. at 824.

    1.    **The Copyright Act Does Not Apply to Extraterritorial Acts**

Plaintiff's two causes of action are for violation of Section 512 of the Copyright Act, known as the Digital Millennium Copyright Act ("DMCA").[1]  Based on those claims, Plaintiff sought and obtained an injunction (the "Injunction") that operates extraterritorially.  See Declaration of Feng Tao in Support of Motion to Amend Injunction, (Mertzel Decl. Ex. E.).

It is well-established, however, that copyright laws do not apply extraterritorially.  *See Robert Stigwood Group Ltd. v. O'Reilly,* 530 F.2d 1096, 1101 (2d Cir. 1976) ("Copyright laws do not have extraterritorial operation."); *Capitol Records, Inc. v. Mercury Records Corp.,* 221 F.2d 657, 662 (2d Cir. 1955) ("the rule we are adopting is in harmony with the settled law that a copyright has no extra-territorial effect."); *American Code Co. v. Bensinger,* 282 F. 829, 833 (2d Cir. 1922) ("The copyright laws of one country have no extraterritorial operation, unless otherwise provided").

---

[1] The Complaint alleges that defendants offer, provide and traffic in DVDFab Software "throughout the world." (¶ 23).  Plaintiff's allegations that the DMCA was violated are not limited geographically (¶¶ 32 and 40).

In *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 261 (2010), the Supreme Court confirmed that "we apply the presumption [against extraterritoriality] in all cases." The Ninth Circuit explained the principle as follows:

> The "undisputed axiom" that the United States' copyright laws have no application to extraterritorial infringement predates the 1909 Act. There is no clear expression of congressional intent in either the 1976 Act or other relevant enactments to alter the preexisting extraterritoriality doctrine. Indeed, the *Peter Starr* court itself recognized the continuing application of the principle that "infringing actions that take place entirely outside the US are not actionable in US federal courts."

*Subafilms, Ltd. v. MGM-Pathe Comm'ns Co.*, 24 F.3d 1088, 1095-96 (9th Cir. 1994) (citations omitted).

The rule that copyright laws have no extraterritorial application is consistent with the "longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Equal Employment Opportunity Comm'n v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991).

Relying on this "canon of statutory interpretation known as the presumption against extraterritorial application," the Supreme Court has held that the Alien Tort Statute does not apply to conduct outside the United States. *See Kiobel v. Royal Dutch Petroleum Co.*, 133 S.Ct. 1659 (2013).[2]

The question of extraterritoriality of the Copyright Act requires analysis of legislative, or prescriptive, jurisdiction. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 n. 22. Justice Scalia explained the concept as follows:

---

[2] Similarly, the Supreme Court relied on the doctrine in holding that Title VII of the Civil Rights Act of 1964 does not apply to regulate the employment practices of American employers who employ American citizens abroad. *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 248 (2010) ("When a statute gives no clear indication of an extraterritorial application, it has none.").

> There is, however, a type of "jurisdiction" relevant to
> determining the extraterritorial reach of a statute; it is known
> as "legislative jurisdiction," *Aramco, supra,* 499 U.S., at 253,
> 111 S.Ct., at 1233; Restatement (First) Conflict of Laws § 60
> (1934), or "jurisdiction to prescribe," 1 Restatement (Third) of
> Foreign Relations Law of the United States 235 (1987)
> (hereinafter Restatement (Third)). This refers to "the authority
> of a state to make its law applicable to persons or activities,"
> and is quite a separate matter from "jurisdiction to adjudicate,"
> see *id.,* at 231.

*Id.* at 813 (Scalia, J. dissenting).  *See also Morrison v. Nat'l Australia Bank Ltd.,* 561 U.S.

247, 254 (2010) (subject matter jurisdiction "refers to a tribunal's power to hear a case.").

   "[S]ince the copyright is indisputably *not* extraterritorial, it makes no sense

to analyze extraterritoriality as an element of the cause of action; it can never be such an

element.  No amendment to a pleading can cure this."  7 PATRY ON COPYRIGHT 25:86.  The

extraterritorial scope of the Injunction therefore exceeds the court's prescriptive authority,

and should be modified.

> *Every* court to have examined the issue has held that Congress
> did not intend the Copyright Act to be applied
> extraterritorially, beginning with the Supreme Court in 1908.
> Extraterritorial acts are, therefore, beyond the subject matter
> jurisdiction of U.S. courts.

7 PATRY ON COPYRIGHT 25:86.  (emphasis in original; citation omitted).  To the extent that

the district court seeks to apply the Copyright Act extraterritorially, it is a question of

subject matter jurisdiction.  *Morrison* at 261 (reiterating that "we apply the presumption

against extraterritoriality in all cases.").

   As a question of the court's subject matter jurisdiction, subject matter

jurisdiction can never be forfeited or waived.  *Arbaugh* at 514 (citing *United States v.*

*Cotton,* 535 U.S. 625, 630 (2002)).  Moreover, the Court has "an independent obligation to

determine whether subject-matter jurisdiction exists, even in the absence of a challenge

from any party."  *Id.*

The Injunction also exceeds the scope of the Court's authority under Section 502 of the Copyright Act, which provides that an injunction "shall be operative throughout the United States." 17 U.S.C. § 502.

### 2.    The Predicate Act Exception Is Incorrect and Inapplicable

Despite the well-established principle that copyright law does not apply extraterritorially, Plaintiff seeks to rely upon a controversial and limited exception to the rule. As shown below, however, the exception does not apply in this case, and is of questionable merit.

Plaintiff relies upon a line of cases that originate with *Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45 (2d Cir. 1939). There, the defendants made negatives of a motion picture in the United States, and later exhibited the picture outside the United States. Acknowledging that exhibition of the positives abroad was not a tort, the court instead relied on the fact that author had the exclusive right to make a "record" from which the work could be reproduced, and found that the negatives were "records" from which the work could be reproduced. Because it was a tort to make the negatives in this country, the court imposed a constructive trust against the profits, including the profits from the foreign exhibition in calculating damages. The *Sheldon* decision has been criticized by a leading copyright treatise as "a significant and significantly erroneous departure from basic principles" and "farfetched, to say the least." 7 PATRY ON COPYRIGHT § 25:89.

In *Update Art, Inc. v. Modiin Publ., Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988), the Second Circuit acknowledged that copyright laws generally do not apply extraterritorially. However, the court recognized an exception for "when the type of infringement permits further reproduction abroad." *Id.* The court held as follows:

> As the applicability of American copyright laws over the Israeli
> newspapers depends on the occurrence of a predicate act in the
> United States, the geographic location of the illegal

18

> reproduction is crucial.  If the illegal reproduction of the poster
> occurred in the United States and then was exported to Israel,
> the magistrate properly could include damages accruing from
> the Israeli newspapers.  If, as appellants assert, this predicate
> act occurred in Israel, American copyright laws would have no
> application to the Israeli newspapers.  *Id.*

The Update Art decision has been criticized as "incorrectly" holding that damages are available for foreign violations of the reproduction right.  7 PATRY ON COPYRIGHT § 25:90 (There is no basis in the statute for the court's predicate act exception to extraterritoriality…").  Further, it is no longer good law following the United States Supreme Court decision in *Equal Employment Opportunity Comm'n v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991).  7 PATRY ON COPYRIGHT 25:91.

Even if the exception is still correct as a matter of law, it does not apply here, where there is not a so-called predicate act of infringement in the United States.  "For the exception to apply, a plaintiff must show that the conduct (1) took place in the United States, and (2) was in violation of the Copyright Act."  *Roberts*, 2009 WL 3572962, at *4. Plaintiff cannot make such allegations, because the software was developed, marketed and sold from China, and sales to purchasers outside the United States do not involve any "predicate" acts of circumvention in the United States.  *See* Feng Decl. ¶¶ 4; 32.  Because there is no predicate act of infringement in the United States, this "purely extraterritorial conduct … is itself non actionable."  NIMMER ON COPYRIGHT § 17.02.

Finally, Mr. Feng's sales of the Unrelated Products should not be hampered by the injunction, as they do not violate AACS' rights under the DMCA.  See Feng Decl. ¶¶ 33-34.  However, such sales were blocked since the Injunction shut down his domain names, web sites and third party payment processors.

### 3.   Mr. Feng Need Only Show a Meritorious Defense Regarding the Injunction

Mr. Feng seeks to vacate the default so as to challenge the extraterritorial scope of the preliminary injunction. Accordingly, he should only be required to demonstrate a meritorious defense with regard to the injunction, not the underlying claims.

It is well-established that defendants are entitled to be heard with respect to the relief granted, notwithstanding their default. For example, in *Brock v. Unique Racquetball and Health Clubs, Inc.*, the court held that the defendant was entitled "to be heard concerning the nature and details of the judgment to be entered..." 786 F.2d 61, 65 (2d Cir. 1986). In *City of New York v. Mickalis Pawn Shop, LLC*, the Court of Appeals explained,

> The defendants did not, by defaulting, forfeit the right to challenge the lawfulness of the injunctions. See *Finkel*, 577 F.3d at 83 n. 6; *Brock*, 786 F.2d at 65; see also *Spamhaus Project*, 500 F.3d at 603-04 (vacating permanent injunction imposed after default judgment as violative of Rule 65(d)); *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 814 (2d Cir.1975) (vacating permanent injunction imposed after default judgment).

645 F.3d 114, 143 (2d Cir. 2011).

Similarly, in *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 813 (2d Cir. 1975), the Second Circuit reiterated that "the fact of liability does not establish a right to a specific form of relief." The court drew an analogy between the need to determine damages unless the amount is absolutely certain, and the granting of an injunction:

> But it is clear that the fact of liability alone does not establish a right to a specific form of relief. Accordingly, unless the amount of damages are absolutely certain, the court is required to make an independent determination of the sum to be awarded. We perceive no reason why a similar requirement should not be applicable to the granting of an injunction, which is appropriately entered only after the exercise of a court's discretion, and upon a finding of the likelihood that the defendant would commit future violations if not enjoined.

*Id.* (citations omitted).

In the same way, Mr. Feng is entitled to be heard with regard to the scope of the Injunction. This doctrine applies regardless of whether the defendant has a meritorious defense. For example, in *Wehrs v. Benson York Group, Inc.,* No. 07 Civ. 3312, 2011 WL 4435609, (N.D. Ill. Sept. 23, 2011), *aff'd sub nom Wehrs v. Wells,* 688 F.3d 886 (7th Cir. 2012) the district denied a defendant's motion to vacate a default judgment due to lack of a meritorious defense, but allowed the defendant to present evidence to rebut the amount of damages claimed by the plaintiff. Id. at *3. A copy of the district court's January 20, 2010 order on the motion to vacate (Doc. # 101) is attached as an addendum to this memorandum of law.

688 F.3d 886 (7th Cir. 2012) (district court denied motion to vacate default judgment due to lack of meritorious defense, but permitted defendant to rebut the amount of damages).

## CONCLUSION

For the reasons set forth herein, defendant Feng Tao respectfully requests that the Court vacate the Clerk's Certificate of Default and permit Tao an opportunity to respond to the Complaint. At a minimum, the Court should hear his Motion to Amend Injunction Pursuant to Rule 59(e).

Dated: New York, New York
      June 20, 2014

SCHOEMAN UPDIKE KAUFMAN
STERN & ASCHER LLP

By: _Nancy J. Mertzel_
Nancy J. Mertzel
551 Fifth Avenue
New York, New York 10176
(212) 661-5030

*Attorneys for Defendant Feng Tao d/b/a Fengtao Software*

# Addendum to Memorandum of Law

Order Form (01/2005) Case: 1:07-cv-03312 Document #: 101 Filed: 01/20/10 Page 1 of 1 PageID #:350

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 07 C 3312 | **DATE** | 1/20/2010 |
| **CASE TITLE** | Wehrs vs. Benson York Group, Inc., et al. | | |

**DOCKET ENTRY TEXT**

Defendant Kevin Wells's motion [91] to vacate the default judgment entered against him is granted in part and denied in part. The judgment is vacated as to damages only. Defendant may defend insofar as he may present evidence to rebut the amount of damages claimed by the plaintiff. The court deems defendant to have denied paragraphs 26 and 36 of the Complaint. Defendant is advised that simply because he is proceeding *pro se*, he is not excused from complying with the rules and orders of court as to presentment of motions and evidence.

■[ For further details see text below.]                                    Notices mailed by Judicial staff.

## STATEMENT

Plaintiff, relying on Rule 60(b)(1) of the Federal Rules of Civil Procedure seeks an order vacating the judgment by default entered against him. To qualify for relief from default judgment under Rule 60(b)(1), Wells must demonstrate (1) that the default was the result of mistake, inadvertence, surprise, or excusable neglect; (2) that he took quick action to correct the default; and (3) that he has a meritorious defense.

    Wells blames his now-withdrawn counsel for his failure to plead, stating that he had no notice of the date he was to file his responsive pleading. The record before this court does not contain a copy of the summons that was served on Wells; thus, the court is unable to confirm that the summons directed Wells to plead by a particular date, nor does the docket reflect any other order directing him to plead. The court therefore credits Well's representation that he lacked notice of the pleading date. This, of course, does not excuse him from responsibility to keep abreast of his case; nonetheless, the court finds his neglect excusable. Wells has moved to vacate within a reasonable time, as the judgment was entered on September 19, 2009 and this motion was filed November 30, 2009, which under the circumstances of his lawyer's failure to communicate clearly with him, as documented in Exhibit A, is reasonable. Wells does not, however, assert a defense other than a broad denial that he made unauthorized transactions in plaintiff's account. He does not specifically deny any of the allegations of the complaint concerning Wells' having purchased, sold, and repurchased 4,100 shares of Cyberonics, Inc., without plaintiff's permission or the ensuing losses. Neither does he assert any affirmative defenses suggesting that even if the complaint is true, plaintiff is barred from obtaining relief. Indeed, Wells seems implicitly to admit the allegatiions, inasmuch as he contests the amount of the damages assessed, noting that some assessed charges were reversed. This is insufficient to state a meritorious defense as to liability. The court will permit Wells to defend, however, with respect to the measure of damages because the interest of justice rests in assessing damages correctly rather than by default. Therefore although the judgment stands regarding liability. it is vacated as to damages.

07C3312 Wehrs vs. Benson York Group, Inc., et al.                                    Page 1 of 1